Erin Rose Ronstadt, SBN 028362
Kristin Kalani, SBN 030240
OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phone: (602) 277-1745
Fax: (602) 761-4443
erin@oberpekas.com
kristin@oberpekas.com

Attorneys for Plaintiff

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Louis Charles Rice, a single man,<br><br>Plaintiff,<br><br>v.<br><br>Metropolitan Life Insurance Company, a plan fiduciary; and Marsden Bldg Maintenance, L.L.C. Welfare Benefit Plan No. 502, an ERISA benefit plan,<br><br>Defendants. | No.<br><br>**COMPLAINT** |

For his claims against Defendants Metropolitan Life Insurance Company ("MetLife") and Marsden Bldg Maintenance, L.L.C. Welfare Benefit Plan No. 502 (the "Plan") (collectively, "Defendants"), Plaintiff Louis Charles Rice ("Mr. Rice" or "Plaintiff") alleges as follows:

**JURISDICTION, VENUE AND PARTIES**

1. This action arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 et seq. ("ERISA").

2. The Plan is a purported ERISA benefit plan established and maintained by Marsden Holding, LLC, American Security, L.L.C., and Marsden Bldg Maintenance, L.L.C. (collectively, "Marsden") for the benefit of its employees. The Plan is a welfare benefit plan that offers group short-term disability ("STD") and long-term disability ("LTD") benefits.

3. Marsden is the Plan Administrator, Plan Sponsor, and Employer.

4. At all relevant times, MetLife administered claims for Marsden under the Plan, acted on behalf of the Plan, and acted as an agent for Marsden.

5. MetLife fully insures LTD benefits under the Plan with a Policy, Group Policy Number 119890-1-G.

6. At all relevant times, Mr. Rice was a participant and beneficiary of the Plan as an employee of Marsden.

7. Mr. Rice is a single person. He currently resides in Ramsey County, Minnesota. At all relevant times, Mr. Rice was a resident of Maricopa County.

8. The Plan and Marsden have their principal place of business in the state of Minnesota. MetLife has its principal place of business in the state of Kentucky. Defendants MetLife and Marsden are licensed and authorized to do business in Maricopa County, Arizona, and reside and are found within Maricopa County within the meaning of the jurisdiction and venue provisions of ERISA, 29 U.S.C. § 1132 and 28 U.S.C. § 1391.

9. This Court has jurisdiction over the subject matter of this action under ERISA, 29 U.S.C. §§ 1132(a), 1132(e)(1), and 28 U.S.C. §§ 2201-02 (declaratory judgments).

10. Venue is proper in this Court under ERISA, 29 § 1132(e)(1) and 28 U.S.C. § 1391(b).

11. Marsden has a duty to administer the plan prudently and in the best interest of all Plan members and beneficiaries. MetLife acted as its agent to make final decisions regarding the payment of disability benefits for the Plan and to administer the Plan. Accordingly, Mr. Rice is informed and believes that Marsden and MetLife are either a "named fiduciary" of the Plan, pursuant to 29 USC § 1133(2); a "deemed fiduciary" pursuant to 29 USC § 1002 (21)(A); or a "designated fiduciary," pursuant to 29 USC § 1105(c)(1)(B).

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ  85012
(602) 277-1745

12. MetLife had actual or apparent authority to act as a fiduciary on behalf of the Plan.

13. MetLife's third-party vendors had actual or apparent authority to act as fiduciaries on behalf of the Plan and administered the Plan in providing services to Defendants.

14. On information and belief, Marsden conferred MetLife with discretionary authority to interpret the Plan and to make eligibility determinations regarding the Plan.

15. MetLife acted under a structural conflict of interest in both administering and paying out on claims under the Plan.

16. Mr. Rice is entitled to *de novo* review of his claims, because given MetLife's structural conflict of interest and its "wholesale and flagrant violations of the procedural requirements of ERISA," *de novo* review is warranted. MetLife should not be entitled to any deference in its decision-making in light of the facts and circumstances of this claim.

## GENERAL ALLEGATIONS

17. All previous and subsequent paragraphs are incorporated by reference.

### *Mr. Rice's Employment*

18. In March 1996, Marsden employed Mr. Rice, where he was promoted to various positions within the company, ultimately becoming a Security Operations Manager.

19. As a Security Operations Manager, Mr. Rice trained and supervised security guards and supervisors and assigned them various patrol locations. Mr. Rice was responsible for overseeing the activities of guard force for multiple assigned areas. He was required to be on-call twenty-four hours a day, seven days a week in order to respond to emergencies and direct on-site subordinates with any procedural issues or questions. Mr. Rice was required to cover shifts for absent employees. He was responsible for scheduling and had to meet various deadlines on a daily basis.

20. Mr. Rice worked as a Security Operations Manager for Marsden until leaving work on June 25, 2013 due to his disability.

### *Mr. Rice's Disability Benefits Under the Plan*

21. To be eligible for LTD benefits, Mr. Rice must be "Disabled … due to Sickness or as a direct result of accidental injury" and, as a result, be "unable to earn: during the Elimination Period and the next 24 months of Sickness or as a direct result of accidental injury, more than 80% of [his] Predisability Earnings at [his] Own Occupation from any employer in [his] Local Economy…" Local Economy is defined as "the geographic area within which [Mr. Rice] resides; and which offers suitable employment opportunities within a reasonable travel distance." A "Security Operations Manager" is considered to be his Own occupation under the Plan.

22. To be eligible for LTD benefits after 24 months, as a result of his Disability, Mr. Rice must be unable to earn "more than 80% of [his] Predisability Earnings from any employer in [his] Local Economy at any gainful occupation for which [he is] reasonably qualified taking into account [his] training, education and experience."

23. Under the Plan, Mr. Rice could be entitled to LTD benefits until sixty-five (65) years of age.

24. Mr. Rice is entitled to receive 60% of his Predisability earnings, before any applicable offsets.

### *Mr. Rice's Receipt of STD and LTD Benefits*

25. During the summer of 2013, Mr. Rice was diagnosed with advanced stage 4 cancer on the base of his tongue, which had metastasized to his neck. His symptoms first developed between February and March 2013, which forced him to take his first leave of absence from work in the history of his employment. At the time, he was experiencing extreme fatigue, anxiety, depression, heart palpitations, and chest pain, which eventually rendered him unable to work.

26. Mr. Rice's last day of work with Marsden was on June 25, 2013. He applied and was approved for STD benefits through Metlife. After receiving STD benefits through the entire 90-day Elimination Period, Mr. Rice applied and was approved for LTD benefits effective September 24, 2013.

27. After his cancer diagnosis, Mr. Rice began aggressive chemotherapy and radiation treatments within the course of several months. He underwent at least forty radiation treatments within a two months' span of time and multiple other chemotherapy treatments, all of which took a tremendous toll on Mr. Rice's ability to function both physically and mentally.

28. After rigorous treatment, Mr. Rice continued to report overwhelming amounts of fatigue. His medical records were replete with evidence that Mr. Rice suffered from cancer-related fatigue ("CRF"), which is a very common and debilitating symptom among cancer patients.

29. Countless studies have been done regarding the prevalence and validity of CRF, which is caused by both the cancer itself and as a side effect of treatment. CRF can last for years, especially when the disease is metastatic in nature such as Mr. Rice's cancer. Additionally, Mr. Rice's cancer of his lymphatic and hematologic systems is known to produce the highest levels of fatigue. Consequently, CRF significantly reduces a patient's ability to work. Mr. Rice continues to suffer from CRF to this day.

30. There is no cure for CRF.

31. In a July 29, 2014 Attending Physician's Statement, Mr. Rice had documented side effects that precluded him from work. In the months following chemotherapy, Mr. Rice consistently reported severe fatigue and the tendency to fatigue easily, as well as cognitive impairment.

32. Around such time, MetLife was conducting a review of Mr. Rice's continued LTD eligibility.

33. Despite evidence to support Mr. Rice's ongoing CRF related symptoms and inability to work, MetLife terminated LTD benefits in a letter dated September 23, 2014 (the "Denial"). In its Denial, MetLife alleged that Mr. Rice was capable of light-duty work and was therefore no longer Disabled under the Plan.

34. As a basis for its Denial, MetLife unreasonably relied on a November 21, 2013 CT scan that showed Mr. Rice's cancer was "stable," and it ignored Mr. Rice's residual effects of his stage 4 cancer diagnosis, which a CT scan is unable to measure.

35. As part of its review, MetLife indicated that a Vocational Review ("VR") was completed on September 18, 2014. The only details of this VR are contained in the minimal internal notes as part of MetLife's December 23, 2014 and July 16, 2015 claim file disclosures.

36. The VRC provided no analysis – especially in light of the Plan's definition – and the few sentences of "review" are blatantly contradictory.

37. The VRC indicated that, upon engagement, a "formal file review" could be completed, but there is no indication that MetLife ever requested this.

38. The VRC's incompetence in finding a comparable DOT position, lack of analysis, and clear ignorance of Mr. Rice's job demands rendered the VR useless.

39. MetLife's subsequent acceptance of the VR is unreasonable. This is especially true, given that examining Mr. Rice's claim from a physical standpoint is an exercise in futility in light of his disabling symptoms due to CRF and prior diagnosis of cancer.

40. MetLife also unreasonably relied on a September 15, 2014 "independent" paper review by Dr. David Peters.

41. Dr. Peters' "review" showed little to no analysis, and the entirety of the review was contained in MetLife's internal notes. Furthermore, there is no indication that Dr. Peters reached out to Mr. Rice's treating providers or considered all of the medical evidence.

42. No medical review was ever conducted by MetLife with respect to Mr. Rice's cognitive issues.

43. After MetLife's Denial, Mr. Rice's symptoms did not improve. Mr. Rice suffered from cognitive impairment and memory loss after chemotherapy, which was documented.

44. With the assistance of counsel, Mr. Rice timely appealed MetLife's Denial on March 20, 2015 (the "Appeal"). With his Appeal, Mr. Rice supplied MetLife with updated medical evidence to support his continued disability.

45. On April 13, 2015, Mr. Rice's appeal was forwarded to an Appeals Nurse Consultant, Gail Chmiel, for review.

46. Ms. Chmiel requested that Mr. Rice's file be reviewed by two independent physician consultants ("IPC") specializing in psychiatry and oncology.

47. On April 22, 2015, Dr. Nicole R. Johnson, MD, FAPA conducted a medical review of Mr. Rice's psychiatric conditions. Her conclusions were contrary to the record and were made without key medical evidence provided on appeal.

48. Mr. Rice testified in his Declaration that he was unable to seek consistent treatment from his regular treating providers, including psychiatric treatment, because he could no longer afford medical care after his LTD benefits were terminated. MetLife ignored this information unreasonably.

49. MetLife's IPCs failed to evaluate Mr. Rice's claim based on the Plan terms.

50. On April 21, 2015, Dr. Lee P. Hartner, MD conducted a medical review of Mr. Rice's physical conditions. Dr. Hartner concluded that "there [was] no evidence that [Mr. Rice] ha[d] any functional restriction or limitation due to a physical condition as of 09/24/2014." MetLife shifted its reasons for denial through the use of its IPCs.

51. MetLife provided Mr. Rice's treating providers the opportunity to respond to the IPC reports.

52.     The information provided by Mr. Rice's treating providers should have clarified Dr. Hartner's concerns. Notwithstanding, and based on Drs. Hartner and Johnson's flawed reviews, MetLife upheld its decision to terminate Mr. Rice's LTD benefits.

### *Mr. Rice's Receipt of SSDI Benefits*

53.     On September 27, 2013, just four days after Mr. Rice's LTD benefits were approved, MetLife referred his claim to its preferred vendor, Allsup, for representation on his Social Security Disability Insurance ("SSDI") matter.

54.     Allsup is a third-party company that works closely with MetLife on a large number of disability claims administered by MetLife. Mr. Rice retained Allsup to represent him on his SSDI matter.

55.     Per MetLife's request and through the assistance of Allsup, Mr. Rice applied for SSDI benefits on December 27, 2013. After an expedited review of his claim, Mr. Rice was awarded SSDI benefits on March 30, 2014. The SSA determined that Mr. Rice was disabled as of June 25, 2013.

56.     Given the severity of Mr. Rice's conditions, the SSA flagged his case as a Quick Disability Determination ("QDD") and Compassionate Allowance ("CAL") in order to provide an expedited decision. These review processes are used only when there is clear indication that the medical condition undoubtedly meets the SSA's stringent disability standards.

57.     The SSA evaluates disability claims by applying certain medical criteria contained in the Listing of Impairments, which focuses on more severe impairments. When a claimant has an impairment that is identified in the Listing of Impairments, it typically renders the non-working individual to be disabled.

58.     According to the SSA, "[t]he Listing of Impairments describes, for each major body system, impairments considered severe enough to prevent an individual from

doing any gainful activity, and "[m]ost of the listed impairments are permanent or expected to result in death, or the listing includes a specific statement of duration."

59. The SSA determined that Mr. Rice was disabled under Listing 13.02-E – Soft tissue tumors of the head and neck – rendering a disability "until *at least* 18 months from the date of diagnosis," and "[t]hereafter, evaluate any residual impairment(s) under the criteria for the affected body system."

60. Because Mr. Rice met this Listing based on the sheer severity and residual symptoms of his condition and treatment, the SSA automatically found him disabled without needing to take into consideration his age, education, and more importantly, his work experience.

61. When the SSA determined Mr. Rice to be disabled, it considered medical records from May 29, 2013 through February 10, 2014, most of which were available to MetLife. In those records, the SSA considered "stable" or normal CT scans without evidence of cancer, and it still found Mr. Rice disabled. This is because regardless of whether the cancer was gone, the SSA understood the residual impact of stage IV cancer and chemotherapy/radiation. Only MetLife attempts to ignore the long-term, debilitating nature of Mr. Rice's condition and the reality of CRF.

62. MetLife required Mr. Rice to apply for SSDI benefits in order to avoid estimation of these benefits. Because MetLife required Mr. Rice to apply for SSDI benefits, MetLife is estopped from denying benefits for the same conditions for which he was approved by the SSA. Conveniently, MetLife was willing to rely on the SSA when it was to its benefit (to collect the offsets for Mr. Rice's SSDI benefits and dependent benefits), but now unreasonably rejects the SSA's determination without good reason.

63. At the time of making its determination, MetLife did not have a copy of Mr. Rice's SSA file. As such, it could not have meaningfully considered the SSA's determination. In its Denial, MetLife asserted that it has "taken into consideration" Mr. Rice's SSDI award, but without the file, this was impossible. The law is clear about

MetLife's obligation to secure the SSA file and explain its reasons for disregarding the SSA's findings.

## COUNT I
### (Recovery of Plan Benefits)

64. All previous and subsequent paragraphs are incorporated by reference.

65. The Plan is an Employee Welfare Benefit Plan as defined in ERISA, 29 U.S.C. § 1002. Defendants are the Plan, Plan administrators, or Plan fiduciaries of the Plan under ERISA.

66. The Plan represents LTD coverage and a promise to provide LTD benefits until Mr. Rice is no longer disabled under the terms of the Plan.

67. Mr. Rice became disabled in 2013 and continues to be disabled under the terms of the Plan. He is unable to perform any gainful occupation in his Local Economy. He has claimed the benefits under the Plan to which he is entitled.

68. Mr. Rice reasonably expected that his conditions met the requirements of Disability as defined by the Plan for LTD benefits, and that he would receive benefits under the Plan until age 65 or until he was no longer disabled.

69. Despite the coverage of Mr. Rice's disability, MetLife has improperly terminated LTD benefits to Mr. Rice in breach of the Plan and ERISA. MetLife's collective conduct was arbitrary, capricious, an abuse of discretion, not supported by substantial evidence, and was clearly erroneous. In light of MetLife's structural conflict of interest and wholesale and flagrant procedural violations of ERISA, Mr. Rice should be entitled to *de novo* review.

70. MetLife has been determined to deny Mr. Rice's claim. It failed to provide Mr. Rice with a description of any additional material or information "necessary" to "perfect the claim" and to do so "in a manner calculated to be understood by the claimant." MetLife "hid the ball" from Mr. Rice by failing to advise him of what was needed to approve the LTD claim, instead changing its reasons for termination. Initially,

it found Mr. Rice had no objective medical evidence to support his disability; by the Final Denial, it concluded that his subjective complaints were "inconsistent" which is not even a Plan term. It added new reasons for termination. MetLife's adversarial actions precluded Mr. Rice from responding to MetLife's rationale for denial at the administrative level.

71. MetLife wrongfully terminated Mr. Rice's disability benefits without providing a coherent explanation for its denials, and in a way that conflicts with the plain language of the Plan, violating 29 U.S.C. §§ 1109, 1132.

72. MetLife did not properly consider all of the available evidence when terminating Mr. Rice's benefits. In doing so, MetLife failed to conduct a full and fair review.

73. MetLife blatantly misstated medical evidence and misrepresented diagnostic testing for its own financial benefit. It excessively relied on the flawed medical reviews and ignored substantial evidence to support Mr. Rice's disability.

74. MetLife tainted its medical file reviewers in the review process by failing to provide its reviewers with all of the relevant evidence. For example, Dr. Johnson was not provided with recent medical records.

75. MetLife emphasized reports that favored a denial of benefits while deemphasizing other reports that suggested a contrary conclusion. By way of example, it gave very little, if any, attention to the SSDI determination.

76. MetLife failed to investigate Mr. Rice's claim adequately, including its failure to conduct an in-person medical evaluation, which might have been beneficial to a full and fair review of Mr. Rice's claim. MetLife had ample opportunity to conduct an evaluation prior to denial, but it depended instead on unreliable evidence to terminate Mr. Rice's LTD benefits.

77. MetLife failed to properly consider the opinions of Mr. Rice's treating and examining physicians. It also failed to reasonably consider Mr. Rice's reported

symptoms and limitations, and side effects of his medications, in determining whether he was disabled under the Plan. MetLife knew about Mr. Rice's worsening issues but chose to ignore those findings. Indeed, MetLife acted arbitrarily and capriciously when it selectively reviewed Mr. Rice's medical records, relying only on those portions of his medical records that supported a denial of benefits.

78. MetLife unreasonably failed to properly consider Mr. Rice's March 30, 2014 SSDI award and the SSDI file. It encouraged Mr. Rice to file for SSDI benefits through its preferred vendor and, when the SSA awarded benefits, MetLife failed to address and distinguish its contrary disability decision. The attempt it did make at considering the SSA decision was disingenuous and lacking in any meaningful rationale. MetLife collected SSDI offsets and then terminated Mr. Rice's LTD benefits with the knowledge that he was financially drowning. MetLife's failure to properly consider the SSA decision is inexcusable, especially because it had access to Mr. Rice's SSA file through the assistance of Allsup, who represented Mr. Rice in obtaining his SSDI benefits.

79. In terminating Mr. Rice's LTD benefits, it is uncontroverted – both in MetLife's internal notes and the medical records – that Mr. Rice's conditions had not changed or improved.

80. MetLife improperly demanded objective medical evidence of Mr. Rice's fatigue and engrafted terms onto the Plan.

81. On information and belief, the file reviewers, IPCs, and vendors used to administer Mr. Rice's claim were financially incentivized to deny Mr. Rice's claim.

82. MetLife used in-house file reviewers, because it knew that the reviews would be unfavorable for the continuation of his benefits.

83. MetLife unreasonably failed to ensure that its in-house file reviewers provided unbiased opinions for purposes of its claims administration.

84. On information and belief, Dr. Hartner has been retained by MetLife on numerous occasions to conduct claims reviews or other evaluations and has a history of bias against claimants.

85. The IPCs arbitrarily reached their opinions based on insufficient evidence or investigation.

86. On information and belief, the peer reviewers and IPCs were not given the Plan or other important records for reaching its decision that Mr. Rice could perform sedentary work.

87. The IPCs or other file reviewers never spoke to Mr. Rice, and they never conducted an in-person evaluation of him.

88. Mr. Rice continues to meet the definition of disability under the Plan.

89. Mr. Rice has exhausted his administrative remedies.

90. MetLife acted arbitrarily and capriciously in terminating Mr. Rice's claim.

91. Pursuant to the coverage provided in the Plan, to ERISA 29 U.S.C. § 1132(a)(1)(B), and to applicable federal and state common law, Mr. Rice is entitled to recover all benefits due under the terms of the Plan, and to enforce his rights under the Plan.

92. Mr. Rice is entitled to reinstatement of any other employee benefits that were terminated, discontinued, or suspended as a result of the termination of his disability benefits. He is entitled to a restoration of the *status quo ante* before LTD benefits were wrongfully terminated.

93. Pursuant to 29 U.S.C. § 1132(g), Mr. Rice is entitled to recover his attorneys' fees and costs incurred herein from MetLife and the Plan.

94. Mr. Rice is entitled to prejudgment interest on the benefits to which he is entitled and on his damages at the highest legal rate until paid.

**WHEREFORE**, on all claims, Mr. Rice prays for entry of judgment against Defendants as set forth in this Complaint, which includes:

A. All past due LTD benefits under the terms of the Plan;

B. Clarifying and determining Mr. Rice's rights to future benefits under the terms of the Plan;

C. An award of Mr. Rice's attorneys' fees and costs incurred herein;

D. An award of prejudgment interest on benefits and damages at the highest legal rate until paid; and

E. For such and further relief as the Court deems just, equitable, and reasonable.

Dated this 16th day of February, 2016.

                OBER & PEKAS, PLLC

                By: *s/ Erin Rose Ronstadt*
                    Erin Rose Ronstadt
                    Attorney for Plaintiff

**OBER & PEKAS, PLLC**
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745